United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8          IN THE UNITED STATES DISTRICT COURT
9          FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
11   In re VERITAS SOFTWARE                    Master File No. C-03-0283 MMC
     CORPORATION SECURITIES LITIGATION
12                                             **ORDER (1) GRANTING MOTION FOR
                                               FINAL APPROVAL OF SETTLEMENT;
13                                             (2) GRANTING MOTION FOR
     _____   APPROVAL OF PLAN OF ALLOCATION;
14                                             (3) GRANTING IN PART AND DENYING
                                               IN PART MOTION FOR ATTORNEYS'
15                                             FEES AND EXPENSES**
16   This Document Relates to ALL ACTIONS
     _____/ (Docket Nos. 210, 212, 214)
17
18          Before the Court are three motions filed July 15, 2005 by plaintiffs: (1) for final

19   approval of settlement; (2) for approval of the plan of allocation of the settlement proceeds;

20   and (3) for an award of attorneys' fees and reimbursement of expenses.  On July 29, 2005,

21   the Court held a fairness hearing and, in light of the objections of class member Michael

22   Malone ("Malone"), requested additional briefing relating to the plan of allocation.

23   Thereafter, plaintiffs filed their supplemental memorandum, to which Malone responded,

24   and plaintiffs thereafter filed a reply.  Having considered the papers filed in support of and

25   in opposition to the motions, the Court rules as follows.

26                              **BACKGROUND**

27   **A.  The Allegations**

28          The following background statement is quoted from the Court's May 19, 2004 order

1    dismissing the First Amended Complaint, and is equally applicable as a general description

2    of the allegations of the Second Amended Complaint:

3    > This is a purported securities fraud class action, brought on behalf of persons
>    who bought Veritas stock between January 3, 2001 and January 16, 2003.
4    > The action is brought against Veritas; its former Chief Executive Officer
>    ("CEO") and Chairman of the Board, Leslie; its current President and CEO,
5    > Bloom; its former Chief Financial Officer ("CFO") and Executive Vice
>    President, Lonchar; and its Executive Vice President of Worldwide Field
6    > Operations, Sallaberry. (See First Amended Class Action Complaint ("FAC"),
>    filed January 16, 2004, ¶¶ 13-14.) Plaintiffs allege that defendants violated
7    > §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"),
>    15 U.S.C. §§ 78i(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17
8    > C.F.R. § 240.10b-5, by causing Veritas to issue false and misleading
>    statements about its financial performance for the fourth quarter of its fiscal
9    > year 2000 ("4Q00") and fiscal year 2001. (See id. ¶¶ 4, 7, 10.)

10   > Veritas is a supplier of "data availability software products[.]" (See id.
>    ¶ 2.) Plaintiffs allege that, in 4Q00, Veritas improperly recognized revenue
11   > and expenses with respect to a September 2000 transaction with America
>    Online, Inc. ("AOL"), in which AOL agreed to purchase $50 million in software
12   > and services from Veritas, and Veritas agreed to purchase $20 million in
>    online advertising from AOL. (See id. ¶¶ 4, 56.) According to plaintiffs, the
13   > AOL transaction was Veritas' largest deal of the quarter. (See id. ¶ 71(n).)

14   > * * *

15   > On November 14, 2002, Veritas filed with the SEC its form 10-Q for the
>    period ending September 30, 2002. (See id. ¶ 104.) In that document,
16   > Veritas disclosed, for the first time, that it had been served with a subpoena
>    by the SEC for documents relating to the AOL transaction. (See id.) Veritas
17   > also stated that it was reviewing its accounting treatment of the transaction,
>    focusing on $20 million in advertising services expense and $20 million of the
18   > sales revenue. (See id.) On disclosure of this news, Veritas' stock dropped
>    from $18.25 to $16.75 on November 15, 2002 on 24,622,200 shares traded, a
19   > 300% increase in volume from the previous day. (See id. ¶ 105.)

20   > On January 17, 2003, Veritas, according to plaintiffs, announced that it
>    would restate its 4Q00 and 2001 financial statements to eliminate
21   > approximately $20 million in revenue and approximately $7 million in net
>    income previously reported for 4Q00. (See id. ¶¶ 108–09.) On January 28,
22   > 2003, Veritas allegedly explained, in a conference call, that the financial
>    restatements were being restated "to reflect that $20 million of license and
23   > support fees paid by AOL [would] not be recognized as revenue and $20
>    million of advertising services paid to AOL would not be recorded as
24   > expense." (See id. ¶ 110.) In the restatement, Veritas allegedly admitted that
>    "the fair value of the goods and services purchased and sold in the AOL
25   > transactions could not be reasonably determined and [Veritas] ha[d]
>    accordingly restated its financial results to reflect a reduction in revenues and
26   > expenses of $20.0 million." (See id. ¶ 9.) Plaintiffs contend that Veritas, in
>    doing so, acknowledged that there was no basis for Veritas' purchase of $20
27   > million in advertising services from AOL and that the AOL transaction was a
>    "roundtrip transaction," i.e., a transaction without economic substance that
28   > was designed to allow each party to fraudulently recognize revenue. (See id.)

2

1   (See Order Granting, with Leave to Amend, Motions to Dismiss First Amended Complaint;

2   Vacating Hearing ("FAC Dismissal Order"), filed May 24, 2004, at 1-2, 4.)

3          **B.  The Settlement**

4          On January 19, 2005, while a motion to dismiss the Second Amended Complaint

5   was pending before the Court, the parties notified the Court that they had reached a

6   settlement of the action.

7          On March 18, 2005, the Court granted preliminary approval of the settlement and

8   ordered the parties to provide notice of the settlement to the class members.  On May 4,

9   2005, after the parties received an objection to the settlement from Malone, in which

10  Malone complained that Veritas option holders were being excluded from sharing in the

11  settlement proceeds, the parties submitted an amended settlement.  On May 6, 2005, the

12  Court ordered the parties to provide notice of the amended settlement to the class

13  members, and set a fairness hearing for July 29, 2005.

14         The revised settlement provides for distribution of $35 million to persons who

15  purchased or acquired Veritas securities (including common stock, 5.25% convertible

16  subordinated notes due 2004, 1.856% convertible subordinated notes due 2006, and

17  options) between January 3, 2001 and January 16, 2003.  (See Order Approving Revised

18  Notice and Providing for Hearing Ex. A-1 (Revised Notice of Pendency and Proposed

19  Settlement of Class Action), filed May 6, 2005, at 1.)

20         The Court has received objections to the settlement from the following class

21  members: (1) New York State Teachers' Retirement System, filed April 7, 2005 and July 1,

22  2005; (2) Public Employee Retirement System of Idaho, filed April 14, 2005; (3)

23  Pennsylvania Public School Employees' Retirement System, filed April 25, 2005; (4)

24  Alameda County Employees' Retirement Association, filed April 25, 2005; (5) Malone, filed

25  April 26, 2005, July 1, 2005, July 28, 2005, and September 27, 2005; (6) J. Wray Pearce,

26  filed June 7, 2005 and August 1, 2005; and (7) Richard Fitch, filed July 15, 2005.

27         The majority of the objections relate to the amount of attorneys' fees, and challenge

28  the amount of fees sought (23.23% of the settlement) as excessive.  In particular, the New

3

1   York Teachers' Retirement System, Public Employee Retirement System of Idaho,

2   Pennsylvania Public School Employees' Retirement System, Alameda County Employees'

3   Retirement Association, J. Wray Pearce, and Richard Fitch ("Fitch") each object only to the

4   amount of fees.[1]

5            The only substantive objections to the settlement were submitted by Malone.  In his

6   initial objections, filed April 26, 2005, Malone objected to the exclusion from the settlement

7   of persons who bought Veritas options.  Malone further objected to the amount of notice

8   provided to shareholders.  In response, as noted above, the settlement was amended to

9   provide for distribution of settlement proceeds to purchasers of Veritas options.  In addition,

10  the Court provided for an additional period of notice to the shareholders.

11           In Malone's objections to the amended settlement, he challenges the following:

12  (1) the provision for payment of settlement proceeds to shareholders who bought Veritas

13  shares or notes after the beginning of the class period and who sold those shares or notes

14  before Veritas disclosed its intent to review its accounting of the AOL transaction ("in-and-

15  out traders"); (2) the imposition of a ceiling or "cap" of 2% of the net settlement fund on the

16  claims of options traders; and (3) a plan of allocation of settlement proceeds that, Malone

17  asserts, violates the requirements of the Private Securities Litigation Reform Act of 1995.[2]

18  (See Malone objections, filed July 1, 2005, at 7; see also Malone objections, filed

19  September 27, 2005.)

20           Each of the objections is addressed further below.

21                                    **LEGAL STANDARD**

22           The Court may approve a class action settlement "only after a hearing and on finding

23  that the settlement . . . is fair, reasonable, and adequate."  See Fed. R. Civ. P. 23(e)(1)(C).

24  _____

25       [1] Fitch also complains that he did not receive notice of the proposed settlement until
    July 9 and requests that the Court ensure that sufficient time was allowed for timely
26  notification of class members.  Any delay in notice to Fitch appears to be an anomaly.
    Evidence has been submitted that the notice was published on May 17, 2005, and that
27  nearly 500,000 notice packages were mailed out beginning on that date.  (See Dales Decl.
    ¶¶ 2-7.)

28       [2] Malone does not object to the amount of attorneys' fees sought.

                                         4

"Assessing a settlement proposal requires the district court to balance a number of factors: the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998).

"It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." Id. "The settlement must stand or fall in its entirety." Id. The Court may not delete, modify, or rewrite particular provisions of the settlement. See id. "Settlement is the offspring of compromise; the question . . . is not whether the final product could be prettier, smarter, or snazzier, but whether it is fair, adequate, and free from collusion." See id.

Special requirements apply to the settlement of securities class actions under the Private Securities Litigation Reform Act ("PSLRA"). See 15 U.S.C. § 78u-4. A class representative's share of the settlement proceeds "shall be equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class." See 15 U.S.C. § 78u-4(a)(4). In addition, the amount of attorneys' fees and costs awarded to the plaintiffs' counsel "shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." See 15 U.S.C. § 78u-4(a)(6).[3]

**DISCUSSION**

_____

[3] The Ninth Circuit has held that this provision "does not mandate a particular approach to determining fees." See Powers v. Eichen, 229 F.3d 1249, 1258 (9th Cir. 2000). "The legislation's primary purpose was to prevent fee awards under the lodestar method from taking up too great a percentage of the total recovery." Id. The statute "does not eliminate the use of the lodestar approach, nor does it require that fees be based on a percentage of net recovery. It simply requires that the fees and expenses ultimately awarded be reasonable in relation to what the plaintiffs recovered." See id.

**A.  Motions for Approval of Settlement and Plan of Allocation**

**1.  Strength of case**

As plaintiffs correctly point out, the settlement in this action was reached after the Court had twice dismissed plaintiffs' complaint and while a third motion to dismiss was pending.  In granting the first two motions to dismiss, the Court, in each instance, found that although Veritas ultimately acknowledged its accounting of the September 2000 AOL transaction was erroneous, plaintiffs had not adequately alleged that Veritas acted with scienter at the time it made the accounting error.  In the Court's second dismissal order, for example, the Court held:  "[P]laintiffs still fail to allege facts sufficient to show that an inference of fraud, rather than negligence, is the most plausible of competing inferences." (See FAC Dismissal Order at 10 (internal quotation and citation omitted).)  As plaintiffs recognize, there was no guarantee the Court would deny defendants' motion to dismiss the Second Amended Complaint, which, as noted, was pending at the time the settlement was reached.

Accordingly, this factor favors approval of the settlement.

**2.  The risk, expense, complexity, and likely duration of further litigation**

As plaintiffs note, even if the action survived the third motion to dismiss, and plaintiffs were able to develop sufficient evidence to defeat a motion for summary judgment, "at trial the risks of establishing liability posed by the conflicting testimony and evidence would be exacerbated by the unpredictability of a lengthy and complex jury trial; the risk that the jury would find that the asserted misrepresentations and omissions were not material; and the risk that the jury would find that Defendants reasonably believed in the appropriateness of their actions at the time and that Lead Plaintiffs failed to prove that Defendants acted with the requisite scienter."  (See Motion in Support of Final Approval of Settlement at 6.)

Moreover, if plaintiffs were able to prove liability, they still would face challenges in proving damages.  Recently, the Supreme Court has made clear that a plaintiff "must prove

that defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss."  See Dura Pharmaceuticals, Inc. v. Broudo, 125 S.Ct. 1627, 1633 (2005).  As plaintiffs note, defendants' experts likely would contend that much or all of the loss experienced by plaintiffs was due to factors unrelated to any wrongful conduct of defendants and, in particular, would likely rely on the "wide stock price fluctuations in the computer software industry during the settlement class period" as the principal factor that caused the prices of Veritas securities to drop during the class period.  (See Motion in Support of Final Approval of Settlement at 7.)

Finally, assuming plaintiffs could prove liability and damages to the satisfaction of a jury, plaintiffs next would face the uncertainty of litigating post-trial motions and appeals. "The expense and possible duration of the litigation should be considered in evaluating the reasonableness of [a] settlement."  See In re Mego Financial Corp. Securities Litigation, 213 F.3d 454, 458 (9th Cir. 2000).  Here, the risk of further litigation is substantial in light of the Court's repeated dismissal of the action and the other factors set forth above.

Accordingly, this factor favors approval of the settlement.

**3. The risk of maintaining class action status throughout the trial**

The parties do not address this factor in their briefing, and the Court is unaware of any risk involved in maintaining class action status in the instant action.

Accordingly, this factor favors neither approval nor disapproval of the settlement.

**4.  The amount offered in settlement**

In determining whether the amount offered in settlement is fair, the Ninth Circuit has suggested that the Court should compare the settlement amount to the parties' "estimates of the maximum amount of damages recoverable in a successful litigation."  See In re Mego Financial Corp. Securities Litigation, 213 F.3d at 459.  "[A] cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair," however.  See id.

Plaintiffs state in their motion that they believe they could prove damages in an amount as high as $177 million.  (See Motion in Support of Final Approval of Settlement at

7

6.)  Thus, a $35 million settlement represents approximately 20% of the maximum amount

of damages plaintiffs believe they could prove at trial.  If one excludes from the settlement

the amount of fees and costs sought, i.e., approximately $8.7 million, the remaining $26.3

million settlement represents approximately 15% of the maximum amount of damages

plaintiffs believe they could prove at trial.  Plaintiffs submit an article stating that from 1991

to 2003, the median percentage of investor losses paid in settlement ranged from a low of

2.7% in 2002 to a high of 7.2% in 1996.  (See Bull Decl. Ex. 1 (Recent Trends in Securities

Class Action Litigation; 2003 Early Update) at 7-8.)  The 15-20% settlement reached in the

instant case substantially exceeds that range.

Accordingly, this factor favors approval of the settlement.

**5.  The extent of discovery completed and the stage of the proceedings**

As the case has not progressed beyond motions to dismiss, no formal discovery has

been taken to date.  Plaintiffs state, however, that although formal discovery has been

stayed pursuant to the PSLRA, lead counsel and their investigators were able to obtain

material information by way of their own investigation, including interviews with confidential

witnesses concerning Veritas and its accounting practices, and had acquired sufficient

knowledge to make an informed decision about the merits of settlement at this stage of the

case.  The Ninth Circuit has stated that, "[i]n the context of class action settlements, 'formal

discovery is not a necessary ticket to the bargaining table' where the parties have sufficient

information to make an informed decision about settlement."  See In re Mego Financial

Corp. Securities Litigation, 213 F.3d at 459.

Accordingly, this factor favors approval of the settlement.

**6.  The experience and views of counsel**

As experienced counsel on both sides of the litigation have approved the settlement,

this factor favors approval of the settlement.

**7.  The presence of a governmental participant**

One of the factors the Court may consider in evaluating the fairness of a settlement

is "the presence of a governmental participant."  See Hanlon v. Chrysler Corp., 150 F.3d at

1026.  The participation of a governmental entity "serves to protect the interest of the class members."  See Marshall v. Holiday Magic, Inc., 550 F.2d 1173, 1178 (9th Cir. 1977).  There is no indication that any government entity participated in the settlement of the instant action.

Accordingly, this factor favors neither approval nor disapproval of the settlement.

**8.  The reaction of the class members to the proposed settlement**

Notice of the settlement was published in Investor's Business Daily on May 17, 2005, and was sent to more than 494,000 potential settlement class members.  (See Dales Decl. ¶¶ 3-5.)  As noted above, the Court has received only one objection to the substance of the settlement, and six objections to the amount of attorneys' fees sought by plaintiffs' counsel.  No class member has objected that the total amount of the $35 million settlement is inadequate, and only Malone has objected to the plan of allocation of the settlement proceeds.

**a.  Malone Objection #1: In-and-out Traders**

As noted above, Malone's first objection is to the settlement's provision for payment of settlement proceeds to class members who bought Veritas shares or notes after the beginning of the class period and who sold those shares or notes before November 14, 2002 ("in-and-out traders"), the date Veritas disclosed its intent to review its accounting of the AOL transaction.

**i.  Alleged Conflict with Dura**

Malone argues that recovery by any in-and-out traders is barred by the Supreme Court's recent decision in Dura.  See Dura Pharmaceuticals, 125 S.Ct. 1627.  In particular, Malone argues that any class members who sold securities prior to the above-referenced disclosure were not damaged by the allegedly fraudulent accounting, because even if they purchased their securities at an inflated price, they would have sold their securities at an inflated price as well, thus suffering no damages as a result of the alleged fraud.

In Dura, the Supreme Court held that "[a] private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss," see id. at 1629, and

9

rejected the Ninth Circuit's holding that a plaintiff establishes loss causation "'if they have shown that the price on the date of purchase was inflated because of the misrepresentation,'" see id. at 1630.  In so holding, the Supreme Court noted that "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss" because "at the moment the transaction takes place, the plaintiff has suffered no loss."  See id. at 1631.  Moreover, if "the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."  See id.; see also In re Compuware Securities Litigation, 386 F. Supp. 2d 913, 920 (E.D. Mich. 2005) (relying on Dura and granting summary judgment in favor of defendant on § 10(b) claim asserted by in-and-out trader, based on inability to demonstrate cognizable damages).

The Supreme Court's opinion in Dura was not issued until April 19, 2005, three months after the instant settlement was reached.  At the time the parties entered into the instant settlement, the Ninth Circuit's opinion in Broudo v. Dura was controlling precedent, and the Ninth Circuit had expressly held therein that "'plaintiffs establish loss causation if they have shown that the price on the date of purchase was inflated because of the misrepresentation.'"  See Broudo v. Dura Pharmaceuticals, Inc., 339 F.3d 933 (9th Cir. 2003), reversed, Dura Pharmaceutical, Inc. v. Broudo, 125 S.Ct. 1627 (2005).  The Ninth Circuit further held that "for a cause of action to accrue, it is not necessary that a disclosure and subsequent drop in the market price of the stock have actually occurred, because the injury occurs at the time of the transaction."  See id. at 938.  Although Dura was pending before the Supreme Court at the time the settlement was reached, the Court is aware of no decision requiring the parties to defer settlement until the law is clarified.  Rather, the parties were entitled to settle the action in light of the risk the law might change in favor of one side or the other; indeed, it is common for settlements to be entered into with the knowledge that the law later may change in favor of one party or the other.  That defendants agreed to pay part of the settlement to a subclass of plaintiffs who later, as a result of the Supreme Court's decision in Dura, may not have been able to recover at trial

1    had the case been litigated does not render the settlement unfair.

2         Additionally, the proposed recovery for in-and-out traders is dramatically lower than

3    the proposed recovery for investors who retained their Veritas securities until after

4    November 14, 2002.  (See Order, filed May 6, 2005, Approving Revised Notice and

5    Providing for Hearing Ex. A-1 (Revised Notice of Pendency and Proposed Settlement of

6    Class Action) at 5-8.)  In that regard, plaintiffs submit evidence that the plan of allocation

7    provides for lower recovery by in-and-out traders because of the difficulty in proving the

8    damages suffered by such traders.  (See Steinholt Decl., filed August 26, 2005, ("8/26

9    Steinholt Decl.") ¶ 12.)  Thus, the limited recovery for in-and-out traders reflects a

10   reasonable assessment of the difficulty plaintiffs may have faced in attempting to prove

11   damages suffered by in-and-out traders in light of the uncertainties in the law prior to the

12   Supreme Court's issuance of the Dura decision.  See, e.g., In re MicroStrategy, Inc. Sec.

13   Litig., 148 F. Supp. 2d 654, 668 (E.D. Va. 2001) (approving settlement allocation that

14   provided for smaller recovery for in-and-out traders because such traders had weaker

15   claims than other class members).  Other courts have held, and this Court sees no reason

16   to disagree, that damages need not be calculated with precision in determining a plan of

17   allocation for settlement proceeds; the only requirement is that the allocation be fair and

18   reasonable.  See, e.g., White v. National Football League, 822 F. Supp. 1389, 1424 (D.

19   Minn. 1993); see also In re American Bank Note Holographics, Inc. Sec. Litig., 127 F.

20   Supp. 2d 418, 429-30 (S.D.N.Y. 2001).

21        Accordingly, the Court finds the allocation of settlement proceeds to in-and-out

22   traders is fair and reasonable, despite the uncertainty as to whether, in light of Dura, such

23   traders could have proven damages at trial.

24                    **ii.  Discrimination against options traders**

25        Malone's next, related, argument is that even if payment of settlement proceeds is

26   not barred by Dura, the settlement unfairly discriminates against Veritas option holders by

27   providing for payment of settlement proceeds to in-and-out traders in Veritas stock and

28   notes, but not to in-and-out traders of Veritas options.  The revised settlement provides for

                                          11

payment of differing sums of money to the class members depending on whether they owned common stock, notes, or options, and when they purchased and sold the securities. For securities acquired on or after January 3, 2001 and sold on or before November 14, 2002, the following chart shows the distribution of the settlement proceeds to such in-and-out traders:[4]

| Type of security | Payment |
|---|---|
| Common stock | the lesser of (a) the purchase price less the sales price, or (b) $.10 |
| 5.25% Notes | per $1,000 par value 5.25% Note, the lesser of (i) the purchase price less the sales price, or (ii) $10.47 |
| 1.856% Notes | per $1,000 par value 1.856% Note, the lesser of (i) the purchase price less the sales price, or (ii) $2.79 |
| Call options | 0 |
| Put options | 0 |

(See Order, filed May 6, 2005, Approving Revised Notice and Providing for Hearing Ex. A-1 (Revised Notice of Pendency and Proposed Settlement of Class Action) at 5-8.)

Malone argues there is no justification for excluding in-and-out traders of Veritas options from participation in the settlement proceeds, while permitting in-and-out traders of Veritas stock and notes to share therein.  Plaintiffs respond with a number of reasons why options are treated differently from stock and notes.

According to plaintiffs' damages calculation expert, Bjorn Steinholt ("Steinholt"), options "involve far more variables than stocks or bonds," thus making it difficult to calculate damages suffered by options traders.  (See 8/26 Steinholt Decl. ¶ 14.)  For example, "during the Class Period there were a myriad of different options with different characteristics such as different strike prices and different expiration dates," and, thus,

---

[4] The settlement provides for varying amounts different from the above to be distributed to shareholders who owned Veritas stock and notes between November 14, 2002 and the end of the class period, January 16, 2003, as well as for distributions to options traders who owned options at the close of trading on November 14, 2002.

1    according to Steinholt, "each such option would be impacted differently by the alleged fraud

2    and could arguably require its own allocation."  (See id. ¶ 16.)  In addition, Steinholt attests,

3    "the relationship between the underlying security and the option is complex, in part because

4    the option generally only has a short life before it expires."  (See id.)  Moreover, because

5    options often do not trade every day, "the lack of observable pricing information" requires

6    that damages be calculated separately for each claim, by use of a valuation model, which,

7    Steinholt attests, is "a daunting, time-consuming and expensive task."  (See id.)  Steinholt

8    further attests that, because an option generally costs "just a small fraction of the cost of

9    the common stock," (see id. ¶ 15), "the economic losses per option are substantially less

10   than losses per common stock," (see id.).  In Steinholt's opinion, even if the requisite

11   analysis were undertaken for each option, "it would in all cases result in a claim of

12   substantially less than 10 cents per option," and the potential recovery "would not justify the

13   extra cost and effort" required to calculate it.  (See id. ¶ 18.)

14         Thus, plaintiffs argue, the options traders are sufficiently different from the in-and-out

15   traders in stock and notes as to justify their differential treatment in the plan of allocation of

16   settlement proceeds; plaintiffs further note that at least one court has approved a plan of

17   allocation that provided for distribution of settlement proceeds to in-and-out traders in stock

18   while excluding in-and-out traders of options.  See Microstrategy, 148 F. Supp. 2d at 668-

19   669 and n.26.

20         The Court finds plaintiffs have demonstrated that the differences in treatment of in-

21   and-out common stock traders as compared to in-and-out options traders is reasonable.

22                    **b.  Malone Objection #2: Cap on payout to options traders**

23         Malone further objects that the settlement establishes a cap on recovery by options

24   traders who owned options at the close of business on November 14, 2002, but does not

25   establish a cap on recovery by investors in Veritas stock and notes.  The revised settlement

26   provides that "the total aggregate allowed claims for option holders shall not exceed 2% of

27   the Net Settlement Fund."  (See Order, filed May 6, 2005, Approving Revised Notice and

28   Providing for Hearing Ex. A-1 (Revised Notice of Pendency and Proposed Settlement of

                                            13

1  Class Action) at 8.)  Malone argues that there is no legal or equitable basis for

2  discriminating against options traders.

3       Plaintiffs submit evidence that a cap was placed on the total recovery by options

4  traders because of the difficulty in calculating damages for such traders.  (See 8/26

5  Steinholt Decl. ¶ 17.)  Unlike the investors in common stock and notes who held such stock

6  or notes on November 15, 2002, whose recovery under the settlement is limited to the

7  respective November 15, 2002 price declines regardless of the amount of their actual loss,

8  options traders who owned options on November 15, 2002 are entitled to recover 100% of

9  their losses.  (See id.)  According to Steinholt, the primary reason for this difference in

10  treatment is that it would be too complex, time-consuming and expensive to calculate the

11  loss suffered by options holders.  (See id.)  Steinholt attests that he attempted to address

12  this difference in the treatment of stock and note traders on the one hand and options

13  traders on the other by limiting total recovery for options traders to two percent of the total

14  settlement proceeds, a figure roughly equating the ratio of the total option volume divided

15  by the total common stock volume during the class period.[5]  (See id. ¶ 17 and n.5.)

16       Accordingly, the Court finds plaintiffs have demonstrated that the 2% cap on total

17  recovery by options holders is fair and reasonable.[6]

18  _____

19     [5]  Plaintiffs submit evidence that during the class period, 1.75 million options
contracts were traded, and more than 6.5 billion shares of common stock were traded.

20  (See Lawrence Decl. ¶ 69.)  Although there is no admissible evidence before the Court as
to the number of shares involved in each options contract, Malone states in his July 28,

21  2005 objection to the settlement that each options contract involves 100 shares of common
stock.  (See Supplemental Memorandum of Michael Malone in Further Support of His

22  Objections to Proposed Settlement, filed July 28, 2005, at 10.)  Assuming that to be the
case, the options trades were roughly 2.7 percent of the total common stock transactions

23  during the class period.

24     [6] The Court notes that other courts, albeit without discussion, have approved
settlements that included caps on recovery for options holders.  See Bull Decl. Ex. 2

25  (Stanley v. Safeskin Corp., Case No. 99-454 (S.D. Cal. 2003) (approving settlement
wherein purchasers of call options limited to $1.6 million of $55 million settlement fund));

26  Ex. 3 (In re InfoSpace, Inc. Securities Litig., C-01-0913 (W.D. Wash. 2004) (approving
settlement wherein options holders limited to 3% of settlement fund)); Ex. 4 (Thurber v.

27  Mattel, Inc., C-99-10368 (C.D. Cal. 2003) (approving settlement wherein options holders
limited to 3% of settlement fund)); Ex. 5 (In re HI/FN, Inc. Sec. Litig., Case No. C-99-4531

28  (N.D. Cal. 2002) (approving settlement wherein options holders limited to 5% of settlement
fund)).

1

2

### c.   Malone Objection #3: Calculation of Distribution of Settlement Proceeds in Alleged Violation of PSLRA

3
Malone further objects that the distribution of settlement proceeds violates the

4
requirements for calculation of damages set forth in the PSLRA.

5
The PSLRA provides that where a "plaintiff seeks to establish damages by reference

6
to the market price of a security, the award of damages to the plaintiff shall not exceed the

7
difference between the purchase . . . price . . . and the mean trading price of that security

8
during the 90-day period beginning on the date on which the information correcting the

9
misstatement or omission that is the basis for the action is disseminated to the market."

10
See 15 U.S.C. § 78u-4(e)(1).  Where a plaintiff sells the security prior to the 90-day period

11
set forth above, "the plaintiff's damages shall not exceed the difference between the

12
purchase . . . price . . . and the mean trading price of the security during the period

13
beginning immediately after dissemination of information correcting the misstatement or

14
omission and ending on the date on which the plaintiff sells . . . the security."  See 15

15
U.S.C. § 78u-4(e)(2).[7]  In the instant case, Malone contends the plan of allocation provides

16
for distribution of settlement proceeds in excess of the amounts permitted under the

17
PSLRA.

18
First, Malone argues, without citation to evidence but without objection from

19
Steinholt, that the mean trading price of Veritas common stock during the 90-day period

20
beginning November 15, 2002 was $17.86.  (See Malone objections, filed September 27,

21
2005, at 3.)  Next, Malone notes that, under the proposed plan of allocation, common stock

22
holders who retained their shares on November 14, 2002 are entitled to the lesser of (a)

23
the purchase price less $16.75 per share or (b) $1.32 per share.  (See Order, filed May 6,

24
2005, Approving Revised Notice and Providing for Hearing Ex. A-1 (Revised Notice of

25
Pendency and Proposed Settlement of Class Action) at 5.)  Malone points out that, under

26
this formula, some stockholders are entitled to a greater recovery than that permitted by the

27
PSLRA.  For example, assuming Malone is correct that the relevant mean trading price is

28

---

[7] Both parties refer to the above-quoted rules as the "90-day bounce back" rule.

$17.86 per share, any stockholder who, before November 14, 2002, purchased his shares for between $16.76 and $17.86 per share and retained them on November 14, 2002, will be entitled to a distribution of the settlement proceeds, even though he would not be entitled to any recovery under the PSLRA.

Similarly, common stock holders who purchased their shares between November 15, 2002 and January 16, 2003, and continued to retain them at the end of the day on January 16, 2003, are entitled, under the plan of allocation, to the lesser of (a) the purchase price less $17.47 or (b) $0.10.  (See Order, filed May 6, 2005, Approving Revised Notice and Providing for Hearing Ex. A-1 (Revised Notice of Pendency and Proposed Settlement of Class Action) at 5.)  Malone argues, again without citation to evidence and again without objection from Steinholt, that the mean trading price of Veritas common stock during the 90-day period beginning January 17, 2003 is $17.79.  (See Malone objections, filed September 27, 2005, at 4.)  Malone points out that, under this formula, some stockholders are entitled to a greater recovery than that permitted by the PSLRA.  For example, assuming Malone is correct that the relevant mean trading price is $17.79 per share, any stockholder who purchased his shares at a cost between $17.48 and $17.79 per share will be entitled to a distribution of the settlement proceeds, even though he would not be entitled to any recovery under the PSLRA.

In response to Malone's argument, plaintiffs do not dispute that the plan of allocation provides for the distribution of settlement proceeds to some class members who would not be able to prove damages were the case to go to trial.  Rather, plaintiffs argue, and the Court agrees, that the PSLRA's limitations on awards of damages do not apply to the allocation of settlement proceeds; plaintiffs point out that the statute refers to the calculation of an "award of damages," rather than to the distribution of settlement proceeds. See 15 U.S.C. § 78u-4(e)(1).  Moreover, the fact that some class members may recover more than they would have recovered at trial does not necessarily render the plan of allocation unfair to the class as a whole; as noted, an allocation of settlement proceeds need not be based on a precise calculation of the damages to which each class member is

entitled, as long as the allocation plan as a whole is fair and reasonable.  See, e.g., White v. National Football League, 822 F. Supp. at 1424; see also In re American Bank Note Holographics, Inc. Sec. Litig., 127 F. Supp. 2d at 429-30.

Plaintiffs' expert, Steinholt, attests that the proposed distribution of settlement proceeds to investors in Veritas common stock is based on the stock prices in effect on November 15, 2002 and January 17, 2003, respectively, the dates Veritas made the relevant disclosures.  (See Steinholt 8/26 Decl. ¶¶ 11-12.)  Steinholt further attests that he did not incorporate all of the limitations of the 90-day bounce back rule into the allocation plan because, under the PSLRA, "the appropriate limitation depends on the moving average on the actual day the share was sold," and thus full incorporation of the 90-day bounce back rule "would introduce significant complexities to the Plan and the claims administration, making it substantially more expensive to calculate and administer Class Members' claims.  (See Steinholt Decl., filed October 14, 2005, ("Steinholt 10/14 Decl.") ¶ 13.)  Steinholt further attests that using the 90-day mean trading price of Veritas common stock as the basis for the allocation of settlement proceeds, rather than the closing prices on November 15, 2002 and January 17, 2003, would "not substantially change the distribution as to the vast majority of the shares (88.5%)."  (See id. ¶ 13 and n.10.)

Because the 90-day bounce back rule does not, on its face, apply to settlements, and because there is no showing that plaintiffs' failure to incorporate all of the requirements of that rule into the plan of allocation has resulted in significant numbers of class members being overcompensated to the detriment of the remainder of the class, the Court finds the plan of allocation is fair and reasonable.

### 9. Conclusion

For the reasons set forth above, the Court finds the proposed settlement and the proposed plan of allocation are fair, reasonable, and adequate, and will GRANT plaintiffs' motion for approval of the settlement and the plan of allocation.

### B.  Motion for Attorneys' Fees and Reimbursement of Costs

As noted above, the majority of the objections concern the amount of attorneys' fees

17

1   sought by counsel for lead plaintiffs.  The revised settlement states that lead counsel "will

2   ask the court for attorneys' fees of approximately 23.23% of the Settlement Fund and

3   reimbursement of out-of-pocket expenses not to exceed $700,000 to be paid from the

4   Settlement Fun." (See Order, filed May 6, 2005, Approving Revised Notice and Providing

5   for Hearing Ex. A-1 (Revised Notice of Pendency and Proposed Settlement of Class

6   Action) at 1-2.)  In plaintiffs' Motion in Support of Application for Attorneys' Fees and

7   Reimbursement of Expenses, lead counsel seeks an award of fees in the amount of

8   23.23% of the Settlement Fund, plus reimbursement of expenses in the amount of

9   $566,623.24.  (See Motion in Support of Application for Attorneys' Fees and

10  Reimbursement of Expenses at 1.)  In terms of dollars, 23.23% of the $35 million

11  settlement fund is $8,130,500.

12              **1. Legal Standard**

13          In securities class actions, attorneys' fees are awarded under common fund

14  principles, rather than pursuant to a fee-shifting statute.  See, e.g., In re Washington Public

15  Power Supply System Securities Litigation, 19 F.3d 1291, 1294-95 (9th Cir. 1994).  "Under

16  the 'common fund' doctrine, 'a litigant or lawyer who recovers a common fund for the

17  benefit of persons other than himself or his client is entitled to a reasonable attorney's fee

18  from the fund as a whole.'" See Staton v. Boeing Co., 327 F.3d 938, 967 (9th Cir. 2003)

19  (quoting Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980)).  "'The doctrine rests on the

20  presumption that persons who obtain the benefit of a lawsuit without contributing to its cost

21  are unjustly enriched at the successful litigant's expense.'" Id. (quoting Boeing Co., 444

22  U.S. at 478).  Under the common fund doctrine, the Court may assess "attorney's fees

23  against the entire fund, thus spreading fees proportionately among those benefited by the

24  suit.'" See id. (quoting Boeing Co., 444 U.S. at 478).

25          Under the common fund doctrine, the Court may award fees under either the

26  percentage-of-the fund method or the lodestar method, and "no presumption in favor of

27  either the percentage or the lodestar method encumbers the district court's discretion to

28  choose one or the other."  See In re Washington Public Power Supply System Securities

1  Litigation, 19 F.3d at 1296.  "As always, when determining attorneys' fees, the district court

2  should be guided by the fundamental principle that fee awards out of common funds be

3  'reasonable under the circumstances.'" Id. (quoting Florida v. Dunne, 915 F.2d 542, 545

4  (9th Cir. 1990)).

5       Similarly, the PSLRA requires that "[t]otal attorneys' fees and expenses awarded by

6  the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the

7  amount of any damages and prejudgment interest actually paid to the class."  See 15

8  U.S.C. § 78u-4(a)(6).  The Ninth Circuit has held that this section "does not mandate a

9  particular approach to determining fees."  See Powers v. Eichen, 229 F.3d at 1258.  It

10  "does not eliminate the use of the lodestar approach, nor does it require that fees be based

11  on a percentage of total recovery."  See id.  "It simply requires that the fees and expenses

12  ultimately awarded be reasonable in relation to what the plaintiffs recovered."  Id.

13       The Ninth Circuit has repeatedly held that 25% of the gross settlement amount is a

14  benchmark for attorneys' fees awarded under the percentage method and that if the Court

15  departs from that benchmark, the record must indicate the Court's reasons for doing so.

16  See, e.g., Powers v. Eichen, 229 F.3d 1249, 1256-57 (9th Cir. 2000); see also In re Pacific

17  Enterprises Securities Litigation, 47 F.3d 373, 379 (9th Cir. 1995) (holding although

18  "[t]wenty-five percent is the 'benchmark' that district courts should award in common fund

19  cases," courts "may adjust the benchmark when special circumstances indicate a higher or

20  lower percentage would be appropriate").  "The benchmark percentage should be adjusted,

21  or replaced by a lodestar calculation, when special circumstances indicate that the

22  percentage recovery would be either too small or too large in light of the hours devoted to

23  the case or other relevant factors."  See Six Mexican Workers v. Arizona Citrus Growers,

24  904 F.2d 1301, 1311 (9th Cir. 1990).

25      **2.  Discussion**

26       The class members who have objected to the amount of attorneys' fees sought by

27  plaintiffs' counsel argue that the instant action is a "garden variety securities litigation" that

28

1    does not justify such a large award of fees.[8]  (See, e.g., New York State Teachers'

2    Retirement System objection, filed April 7, 2005, at 1.)  As noted, however, Ninth Circuit

3    case law suggests that even in a "garden variety" securities class action, counsel ordinarily

4    is entitled to an award of fees in the amount of 25% of the settlement.  See Powers v.

5    Eichen, 229 F.3d at 1256-57; see also In re Pacific Enterprises Securities Litigation, 47

6    F.3d at 379.

7         The Ninth Circuit has noted that the Court may, but is not required to, compare the

8    lodestar and the 25% benchmark to determine if the 25% benchmark results in an

9    inappropriately high or low fee.  See Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1050-51

10   (9th Cir. 2002) (observing that calculation of lodestar provides check on reasonableness of

11   percentage award; affirming district court's conclusion that fee award of 28% of fund and

12   3.65 times lodestar amount was reasonable); Fischel, 307 F.3d at 1001, 1007 (finding no

13   error where district court awarded fees under lodestar method and failed to compare

14   lodestar with 25% benchmark).  In the instant case, plaintiffs present evidence that the

15   lodestar amount is approximately $1.5 million.  (See Motion at 16; see also Appendix of

16   Plaintiffs' Counsel's Declarations.)  As noted, the 23.23% fee sought by lead counsel

17   results in a fee award of $8,130,500.  In Vizcaino, the Ninth Circuit provided an appendix

18   demonstrating that fee awards in common fund cases that settled for $50 to $200 million

19   between 1996 and 2001 have included multipliers of 0.6 to 19.6 times the lodestar amount,

20   with the majority falling within the 1.0 to 4.0 range.[9]  See Vizcaino, 290 F.3d at 1051 and

21   n.6 and Appendix.  Here, a fee award of $8,130,500 would be the equivalent of the lodestar

22   amount multiplied by 5.42, a figure considerably higher than the typical 1.0 to 4.0 multiplier

23   range noted by the Ninth Circuit.

24        The Court finds that a multiplier of 5.42 times the lodestar amount is excessive

25

26        [8] There is no objection to the amount of costs sought by plaintiffs.

27        [9] District courts have the discretion to use multipliers to enhance the lodestar in
     common fund cases.  See, e.g., In re Washington Public Power Supply System Sec. Litig.,
28   19 F.3d at 1294 n.2, 1301.

under the circumstances, and, accordingly, the Court will reduce the amount of fees to

$6,000,000, i.e., the equivalent of roughly 17% of the settlement fund or four times the

lodestar amount, which is within the typical range identified by the Ninth Circuit in Vizcaino.

See id.  The Court recognizes that plaintiffs' counsel, as noted above, achieved an

excellent settlement for the class members, and that courts should reward attorneys in

common fund cases "for taking the risk of nonpayment by paying them a premium over

their normal hourly rates for winning contingency cases."  See Vizcaino, 290 F.3d at 1051.

The excellent results achieved and the risks of the litigation are adequately compensated,

however, by a fee award of four times the lodestar amount, which, as noted, is at the high

end of the typical range of multipliers identified in Vizcaino.  See, e.g., Fischel, 307 F.3d at

1007-08 (approving multiplier of 1.5 times lodestar to account for 100% recovery for class;

reversing on other grounds); see also In re HPL Technologies, Inc. Securities Litigation,

366 F. Supp. 2d 912, 922-925 (N.D. Cal. 2005) (declining to award fees in requested

amount of 15% of settlement fund where such amount was equivalent of 3.59 times

lodestar amount; awarding fees in amount of 11% of settlement fund, or 2.87 times

lodestar); In re Infospace, Inc. Securities Litigation, 330 F. Supp. 2d 1203, 1212, 1214,

1216 (W.D. Wash. 2004) (declining to award fees in amount of 25% of settlement fund

where such amount was equivalent of 7.5 times lodestar amount; awarding fees in amount

of 3.5 times lodestar, or 12% of settlement fund).

     As there is no objection to the amount of costs sought by plaintiffs, the Court will

award $566,623.24 in costs, the full amount sought.

**CONCLUSION**

     For the reasons set forth above,

     1.  Plaintiffs' motions for final approval of settlement and for approval of the plan of

allocation of settlement proceeds are GRANTED.

     2.  Plaintiffs' motion for an award of attorneys' fees and reimbursement of expenses

is GRANTED in part and DENIED in part.  Plaintiffs are awarded attorneys' fees in the

1  amount of $6,000,000, and costs in the amount of $566,623.24, for a total of

2  $6,566,623.24.

3      **IT IS SO ORDERED.**

4  Dated: November 15, 2005                                   MAXINE M. CHESNEY
                                                United States District Judge